(30 App. Div. 564.)

### STANDARD FASHION CO. v. SIEGEL—COOPER CO. et al.

(Supreme Court, Appellate Division, First Department.    June 10, 1898.)

1. EQUITY—JURISDICTION—INJUNCTION—SPECIFIC PERFORMANCE.

Even though a court of equity is unable to grant specific performance of an agreement involving the sale of plaintiff's goods in the defendant's store, because the business involved would be of a continuous nature, and thus brought under the management of the court, it may nevertheless grant an injunction restraining the defendant from violating a negative covenant not to sell or allow the sale of rival goods on its premises during a specified term.

2. SAME—PLEADING.

In an action for such relief, a complaint alleging that a business rival of the plaintiff, who is joined as a defendant, with knowledge of the contract between the principal parties induced the principal defendant to break its agreement, and promised to save it harmless therefor, and to defend at its own cost any action brought in consequence thereof, sets forth a cause of action against such third party, also, for an injunction.

Ingraham, J., dissenting.

Appeal from special term, New York county.

Suit by the Standard Fashion Company against the Siegel-Cooper Company and the Butterick Publishing Company, Limited. From a judgment sustaining a demurrer (50 N. Y. Supp. 1056) to the complaint, plaintiff appeals.    Reversed.

This suit was brought in equity to enjoin the violation of certain negative covenants, and to decree the specific performance of certain affirmative covenants, contained in a written agreement entered into between the plaintiff and the defendant the Siegel-Cooper Company, under which the business of selling the plaintiff's paper patterns in the said defendant's store for the joint profit of the contracting parties during a period of more than two years was to be carried on upon various terms and conditions set forth in the agreement, a copy of which is annexed to the complaint, and is as follows: "In consideration of the sum of one dollar by each to the other in hand paid, and hereby acknowledged, the above parties hereby mutually agree as follows: The Siegel-Cooper Company is hereby appointed an agent for the sale of Standard patterns and Standard fashion publications for a term of two years from the date the contract goes into effect; and said term to be extended from year to year thereafter until closed by three months' notice in writing by either party, to be given within thirty days after said two years, or any one year thereafter.    The Standard Fashion Company agrees to conduct at its own expense and risk a pattern department on the ground floor of the Siegel-Cooper Company's store on Sixth avenue and 18th street, New York City; said Standard Fashion Company furnishing its own employés; such employés to be subject to the employés' rules of the Siegel-Cooper Company.    The Standard Fashion Company further agrees to furnish free of charge not less than two hundred and fifty thousand (250,000) eight-page fashion sheets, of the kinds sold at ten dollars per thousand, to the Siegel-Cooper Company, per annum, as long as this contract continues, and to print the advertisements of said Siegel-Cooper Company on front and back thereof, without charge, to be changed monthly if so desired.    Such fashion sheets to be distributed by the Siegel-Cooper Company from its store or from pattern counter, or any other of the business, without expense to the Standard Fashion Company.    The Siegel-Cooper Company to furnish wrapping paper and twine, free delivery,

and other store facilities. Said Siegel-Cooper Company agrees not to sell or allow to be sold on its premises during the duration of this contract any other make of paper patterns. Siegel-Cooper Company agrees to pay over to the Standard Fashion Company two-thirds of all the money received from the sale of patterns and fashion publications, making weekly settlements with the Standard Fashion Company; said Siegel-Cooper Company to make no charge for cashiering. The remaining one-third to be the remuneration of said Siegel-Cooper Company for the permission to the Standard Fashion Company to conduct said department. The said Siegel-Cooper Company agrees to allow the use of the present pattern fixtures and the present position for paper patterns; but, in case a change of location should be deemed advisable, such new location not to be less prominent, nor to occupy less space, than the present one, except between Thanksgiving and Christmas of each year. This contract to go into effect either on September 12th or December 12th, 1897, according to the choice of said Siegel-Cooper Company; such choice depending upon the question of whether the contract between the said Siegel-Cooper Company and the Butterick Publishing Company, now existing, will be terminated in September or December of this year. The Standard Fashion Company agrees to assume all risk of loss by fire, water, etc., or risk of theft, or other unforeseen damage to or destruction of pattern stock, and to hold the Siegel-Cooper Company harmless in that respect. Said Siegel-Cooper Company to make, at the expense of the Standard Fashion Company, frequent mention of the fact that they are agents for the sale of the Standard patterns, in its daily New York newspaper advertisements, and also to allow reasonable display of attractive show cards and signs furnished by the Standard Fashion Company, and subject to the approval of said Siegel-Cooper Company, at convenient places in its store; the expense of such signs to be entirely borne by the Standard Fashion Company." The Siegel-Cooper Company notified the plaintiff that they declined to carry out the contract, and the complaint alleges that the other defendant, the Butterick Publishing Company, induced its co-defendant to break the contract, and to enter into a similar one with it. The complaint further alleges that the plaintiff will be subjected to irreparable loss and injury if the defendant the Siegel-Cooper Company be suffered to break its engagement with it, not only by the direct loss in its own business, but also by permitting its rival and competitor, the Butterick Publishing Company, to obtain the advantages which it (the plaintiff) would have obtained from the exclusive sale of patterns in the store of the Siegel-Cooper Company, and that it would be thus damaged "in a manner altogether impossible to be compensated for in an action for money damages." Both the defendants demurred to the complaint. The special term granted an order sustaining the demurrers, and from the interlocutory judgment thereupon entered this appeal is taken.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

John M. Bowers, for appellant.
Edward C. Perkins, for respondents.

O'BRIEN, J. The contention that it does not appear from the complaint that there is no adequate remedy at law, we do not think is sustained; for whatever may be the rule as to the extent of proof which, in support of that allegation, the plaintiff must present upon the trial, a more liberal rule must be indulged in, in determining the sufficiency of the complaint upon demurrer. It is in effect alleged that the plaintiff has no adequate remedy at law, and that is sufficient.

The further contention that the contract relied upon is not one which the court can decree should be specifically performed, because the business would be of a continuous nature, and thus brought un-

der the management of the court,—a burden which it is well settled a court of equity will not assume,—must be regarded as established, not only by a long line of authorities, but also by the reasoning in the opinion in Fargo v. Railroad Co., 3 Misc. Rep. 205, 23 N. Y. Supp. 360.   This case the learned judge at special term regarded as an authority, not only for the proposition that the court should not decree specific performance of the affirmative covenants of the agreement, but also to sustain the proposition that it would not enjoin the violation of the negative covenant by which the Siegel-Cooper Company agreed "not to sell or allow to be sold on its premises during the duration of this contract any other make of paper patterns."   It is true that in the opinion in the Fargo Case, supra, there are some expressions which lend support to this view; but it must be read in the light of the precise questions there under discussion, and directly involved and passed upon.   As correctly stated in the syllabus, there the plaintiff brought action for specific performance of a contract; and, on application for a mandatory injunction pendente lite, it appeared that the contract in question was exceedingly comprehensive, and most minute in its working details; that those details provided for special and varying contingencies, and the elements of discretion and judgment with regard thereto; that the due execution thereof would involve the ascertainment of what is right and proper the parties thereto should do from day to day with regard to ever-varying circumstances.   Held, that the action could not be maintained, and the injunction should be denied. It will be noticed that what was there sought was a mandatory injunction pendente lite, and that was the purpose for which the action itself was brought, namely, to require the defendants specifically to carry out their contract; and, the court having reached the conclusion that it would not decree any such final relief, the preliminary injunction was properly denied.   As therein said:

"The question, therefore, is whether a case for specific performance is here made out; and that depends, in the first instance, upon the nature of the contract sought to be enforced.   The general rule is not to decree a specific performance of contracts which by their terms stipulate for a succession of acts whose performance cannot be consummated by one transaction, but will be continuous, and will require protracted supervision and direction."

It appears that there was an exclusive contract made with the plaintiff, but it does not appear that an attempt was made to prevent the defendants entering into a contract with some one else.   What was sought in the action was a preliminary and final mandatory injunction, compelling the defendant to carry out its contract.   The precise question here involved, as to the right of the court to enforce by injunction the negative covenants, was not there presented nor decided.   The relief here demanded is twofold, namely, to compel the defendant the Siegel-Cooper Company specifically to perform, and to prevent that company from selling, or permitting any rival or competitor of the plaintiff to sell on the premises, during the term of the contract, any other make of paper patterns.   The right of a court of equity to prevent the violation of negative covenants contained in a contract which, in its entirety, it could not decree should not be specifically performed, is not a new question; and, although

there are decisions to the contrary in the courts of our own state and of the United States, the entire drift of the later cases tends to support the right of the court to prevent the violation of negative covenants, by injunction. In Singer Sewing-Mach. Co. v. Union Buttonhole & Embroidery Co., 1 Holmes, 253, Fed. Cas. No. 12,904, this question is very ably and thoroughly discussed. As therein said:

"The two points of law are not without difficulty. The relief asked is specific performance and injunction. It is argued with great ability by the defendants that the complainant is not entitled to specific performance, and that, therefore, it cannot have an injunction which is merely auxiliary. Granting the premises, I am not prepared to concede the conclusion. If the court cannot order a contract for the making of buttonhole machines to be specifically performed, by reason of the impossibility of superintending the details of such a business, it does not follow that the bill may not be retained as an injunction bill. It was formerly thought that an injunction would not be granted to restrain the breach of any contract unless the contract were of such a character that the court could fully enforce the performance of it on both sides."

And the judge writing the opinion in that case, after an examination of all the cases, thus concluded:

"I think the fair result of the later cases may be thus expressed: If the case is one in which the negative remedy of injunction will do substantial justice between the parties, by obliging the defendant either to carry out his contract or lose all benefit of the breach, and the remedy at law is inadequate, and there is no reason of policy against it, the court will interfere to restrain conduct which is contrary to the contract, although it may be unable to enforce a specific performance of it. * * * The court cannot, perhaps, superintend the performance of a contract to manufacture machines, but it can restrain the defendants from selling in violation of their agreement."

And in Chicago & A. Ry. Co. v. New York, L. E. & W. R. Co., 24 Fed. 521, it is said:

"It is one thing, however, to stop a party from doing that which he cannot rightfully do, and another to undertake to compel him to do an act involving the exercise of faculties and judgment which are peculiar and personal to himself; and the argument from inconvenience which may properly be invoked when the court is asked to decree a specific performance would, if it should be controlling when the court is asked to restrain the doing of an unlawful act, apply to all cases in which the corrective power by injunction is exercised."

That a departure has been made from the rule laid down in the earlier cases, even to the extent of decreeing the specific performance of a continuous contract with varied and extensive details, requiring the frequent intervention of the court, is further shown by two other cases, one in the supreme court of the United States, which has been followed by our own court of appeals: Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243; Prospect Park & C. I. R. Co. v. Coney Island & B. R. Co., 144 N. Y. 152, 39 N. E. 17. It is urged, however, by the respondents, that these cases are exceptions to the principle laid down in the earlier cases, wherein the courts, departing from the general rule, have decreed specific performance of contracts relative to the management of railroads, on the ground that, railroads being public functionaries, this burden should be assumed by the court, not out of consideration for the plaintiff, but out of regard for the rights of the public at large. Though we regard these as exceptions

to the general rule that courts will not decree the specific performance of contracts which stipulate for a succession of continuous acts, demanding of the courts constant supervision during the term of such contract, yet they indicate a tendency upon the part of courts of equity to extend the former jurisdiction exercised by it to new cases, which, under more modern conditions, are constantly arising. As well expressed by Pomeroy in his work on Equity Jurisprudence (section 111):

"Equity has followed the true principle of contriving its remedies so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated. It has therefore never placed any limits to the remedies which it can grant, either with regard to their substance. their form, or their extent, but has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed."

It cannot be doubted that courts are instituted to enforce rights, to redress injuries, and to restrain contemplated wrongs; and it is difficult to see any sound reason which should prevent a court from granting any relief because it cannot give all the relief to which the party may be entitled. We think that no sound principle is violated in holding that the court should extend its relief as far as it is able, and where it cannot, as in this case, enforce the specific performance of the affirmative covenants by compelling the defendant to carry out its contract, it has the power, and it should exercise it, to prevent the defendant the Siegel-Cooper Company from obtaining an advantage from a breach of its agreement, and inflicting a double wrong—First, in depriving plaintiff of the right to sell; and, secondly, by conferring such rights on a business competitor.

In addition to railroad cases, we are all familiar with others, affecting singers, actors, and persons skilled in particular arts, wherein it was held that, though the court could not compel them to perform their agreement, it would prevent the employment of their talent or skill for others during the contract term. It is insisted, however, that these, like the railroad cases, are exceptions to the general rule, and that they are to be distinguished from the case of a contract such as is here involved, upon the ground, as claimed, that in all these cases the injunction practically amounted to a complete decree of specific performance of the contract, and that the enforcement of the negative covenant, express or implied, covered the whole ground of controversy between the parties, while here negative covenants are but a portion of the contract, and that it would be inequitable to enforce a part without enforcing the whole. We do not regard the distinction thus sought to be made as sound, because the cases referred to cannot be reconciled upon the theory that the enforcement of the negative covenant, enjoining a person from exhibiting his skill for anyone else, was a complete enforcement of a contract which required the exhibition of such personal services on behalf of the one in whose favor the injunction

was awarded. The real ground, we take it, is that where a con-
tract is made, of such a character that the court cannot decree
specific performance, but it is right that it should prevent a con-
templated wrong, the court, because it could not afford all, has not
hesitated to afford such relief as was practicable. We think what
was said in Lacy v. Heuck, 12 Wkly. Law Bul. 209, is pertinent:

"Why should not the plaintiff in such a case have an injunction? His con-
tract rights are clear, the proposed violation of them is clear, and here is a
remedy not impracticable. It would seem to be a sound general rule that
where the right of one party is plain, and the wrong done or intended to be
done by the other equally plain, the court should not be sparing in the ap-
plication of its remedies, but rather should grant them with a liberal hand."

In view of the very extended and able discussion which the ques-
tion here involved has received in a number of cases, which we.
may concede cannot be reconciled, it is unnecessary to extend this
opinion; being entirely satisfied to rest it upon the reasoning and
the cases cited in the decision from which we have already quoted,
of Singer Sewing-Mach. Co. v. Union Buttonhole & Embroidery Co.,
supra.

As to the defendant the Butterick Company, which separately
demurs, the complaint alleges, in substance, that, with knowledge
of the existence of the contract between the plaintiff and the Siegel-
Cooper Company, it induced the Siegel-Cooper Company to break its
agreement with plaintiff, and promised to save such company harm-
less because of such breach, and further agreed to defend at its
own cost and expense any action that might be brought against that
company because of the breach. To permit the Butterick Company,
upon the facts alleged, to obtain a benefit, would be to allow it to
profit by its own wrong. In New York Bank-Note Company v.
Hamilton Bank-Note Engraving & Printing Co., 50 N. Y. Supp. 1093,
this court decided (April 15, 1898) that, where there was an exclusive
contract between the plaintiff and one defendant, the plaintiff, as
against the other defendant, who, with notice of the plaintiff's
rights, had contracted with its co-defendant, was entitled to relief,
upon the ground, not of any contractual relation, but that such
other defendant had engaged knowingly in a plan or contract to
wrong and injure the plaintiff.

Taking the facts stated in the complaint, therefore, as true, we
think that the plaintiff was entitled to relief by way of injunction
to restrain the violation of the negative covenant contained in the
contract, and that the decision below, that the plaintiff was entitled
to no relief, was error. The judgment, accordingly, should be
reversed, with costs to the appellant, with leave, however, to the
defendants to withdraw demurrers, and answer over, on payment
of costs. All concur, except INGRAHAM, J., dissenting.

INGRAHAM, J. I dissent. The action is brought specifically
to enforce an agreement made between the plaintiff and the defend-
ant Siegel-Cooper Company. The demand for relief is that it be
adjudged and decreed that the defendant Siegel-Cooper Company
carry out its said agreement with plaintiff, and specifically perform

the same, upon the plaintiff complying with all the conditions of said agreement on its part to be performed; that it be adjudged and decreed that the defendant the Siegel-Cooper Company, its agents and servants, be enjoined and restrained from selling or allowing to be sold on its premises from December 12, 1897, to December 12, 1899, and for three months thereafter, any paper patterns except those made by plaintiff; and that the defendant the Butterick Publishing Company be enjoined and restrained from December 12, 1897, to December 12, 1899, and for three months thereafter, from selling its paper patterns on the premises of the defendant the Siegel-Cooper Company, and from selling its paper patterns to said Siegel-Cooper Company during said period. The contract sought to be enforced is an executory contract to last for two years, and from year to year, until terminated by a three-months notice in writing. It imposes upon the contracting parties various duties and obligations to each other, to continue during the period for which the contract shall continue. The plaintiff is to conduct at its own risk and expense the pattern department, and to furnish its own employés; such employés to be subject to the employés' rules of the Siegel-Cooper Company. The plaintiff is also to furnish, free of charge, not less than 250,000 eight-page fashion sheets, and to print the advertisements of the Siegel-Cooper Company on front and back thereof, without charge; to be changed monthly, if so desired. These obligations of the plaintiff are to be continuous; involving from day to day the services of the plaintiff's employés, and the furnishing by the company of these paper patterns. Then the Siegel-Cooper Company is to furnish for the use of the plaintiff the use of the present pattern fixtures, and the present position for paper patterns, but with a provision that, if a change of location should be desirable, the new location is not to be a less prominent one than the present one. The Siegel-Cooper Company is to furnish wrapping paper and twine, free delivery, and other store facilities, and is not to sell or allow to be sold on its premises patterns of any other make. The Siegel-Cooper Company is to make frequent mention of the fact that it is agent for the sale of the Standard patterns, in its daily New York newspaper advertisements, and to allow reasonable display of attractive show cards and signs furnished by the Standard Fashion Company, and subject to the approval of the Siegel-Cooper Company, at convenient places in its store. All of the provisions relate to the carrying on of a business in the defendant's store by the plaintiff,—regulate the conduct of such business; leaving much to the discretion of both parties, and to be determined by the changing conditions of the business from day to day. Can such a contract be specifically enforced by a court of equity? It seems to me clear that it cannot. The question was exhaustively examined in the case of Fargo v. Railroad Co., 3 Misc. Rep. 205, 23 N. Y. Supp. 360. While the contract under consideration was somewhat different, substantially the same question was presented as is here under consideration. There Mr. Justice Barrett says, after analyzing the contract:

"Suffice it to say that the contract is exceedingly comprehensive, and that its working details are most minute. These details almost invariably provide for special and varying contingencies, and the elements of discretion and judgment with regard to such contingencies abound. It is apparent that the due execution of such a contract must involve the ascertainment of what it is right and proper that the parties should do from day to day with regard to ever-varying circumstances. A decree for specific performance, couched in the precise terms of the contract itself, would be but the beginning of the judicial work."

And as was said by Mr. Justice Strong in Marble Co. v. Ripley, 10 Wall. 358:

"Another serious objection to a decree for a specific performance is found in the peculiar character of the contract itself, and in the duties which it requires of the owners of the quarries. These duties are continuous. They involve skill, personal labor, and cultivated judgment. It is, in effect, a personal contract to deliver marble of certain kinds, and in blocks of a kind, that the court is incapable of determining whether they accord with the contract or not. The agreement being for a perpetual supply of marble, no decree the court can make will end the controversy."

The rule covering specific performance of contracts of this character is stated in the American and English Encyclopædia of Law (volume 22, p. 1002) as follows:

"The specific performance of a contract of personal service will not be enforced, for there is no practical means of executing the decree. Contracts to be performed in the remote future, or the execution of which involves the performance of a continuous and protracted series of acts, or the doing of some act or thing which demands the exercise of the individual skill, discretion, taste, or talent of the promisor, are, of necessity, incapable of judicial supervision or control. For the breach of such agreements the party injured must be left to his remedy in a court of law."

And the cases cited in the note to this statement of the rule show that it has been almost universally applied in the courts of this country and in England. While this is conceded to be the general rule, it is claimed that certain exceptions have been recognized, and that where the contract contains a negative covenant, although the affirmative covenant could not be enforced, a court will enforce the negative covenant by injunction; but the cases in which such a negative covenant have been enforced involved a performance of a defined class of contracts, where the services to be rendered or the contract to be performed required the performance of certain specific acts, which could be performed only by the defendants, and were based upon the decision of the case of Lumley v. Wagner, 1 De Gex, M. & G. 604. In that case a singer had agreed to sing at the plaintiff's theater for three months, and not to sing at any other; and the court enjoined her from performing at a rival establishment, though it was clear and was admitted that the court could not oblige her to sing for the plaintiff. It will be noticed that the exceptions to the general rule have been in cases where the obligation to be performed on the part of the plaintiff was one that could be specifically performed by the court, or where the defendant would have had a right of action in damages for a failure to perform, which would have been adequate and easily ascertained, and would have af-

forded the defendant all the relief against the plaintiff to which. he was in any way entitled. In Lumley v. Wagner, supra, the defendant had agreed to pay the plaintiff a sum of money for services that were to be rendered. The defendant had broken her contract, in refusing to perform the services, and was about to perform at another theater, in violation of her covenant contained in her contract of service. The case recognized, and those cases that have followed it have recognized, that the extraordinary character of the services to be rendered, and the fact that no one but the defendant could perform the service which was to be rendered, justified the court in making it an exception to the general rule, and enforcing a negative covenant which was an essential part of the contract, and which was an important element in inducing the plaintiff to execute the contract. We are also referred to several cases of the federal courts in which contracts made by common carriers, or corporations performing some public service, have been specifically enforced. But these cases appear to be based upon the peculiar nature of the service that was to be rendered, relating to a business in which the public had an interest, such as common carriers or telegraph companies, or else cases in which the contract had been performed on the part of the plaintiff; and it was after the defendant had received the consideration upon which he had covenanted not to do a particular thing, and where the damages that would flow from a breach of his contract were incapable of definite ascertainment. The extent to which courts have carried this exception to the general rule has greatly varied, and it is impossible to reconcile the cases, and hardly possible to state any general rule from them. There are, however, certain principles that have been established; and I think that they should be followed, except as to a case which is brought plainly within some of the exceptions to the rule which have been recognized. It is a general principle, applied in all actions for specific performance, that, where the obligation to be performed by the plaintiff cannot be enforced, the court will not attempt to enforce any part of the contract; and, while some of the cases have apparently violated this principle, the great mass of the authorities recognize and enforce it.

The allegation of the complaint, and the one fact urged by the plaintiff as the basis of its right to maintain this action, is that there could be no adequate remedy at law, because it would be impossible to ascertain the damage that would flow to either party from a breach of the contract by the other party. We have seen that, from the nature of the contract, it would be impossible for the court to specifically perform it. If the plaintiff neglected and refused to perform the contract on its part,—failed to provide the necessary material for carrying on the business, and the employés to carry it on,—admitting the allegations of the complaint to be true, the defendant could have no remedy at law for a breach of the contract, as no damage could be proved to have resulted from such a breach. It could have no remedy by specific performance, as the contract is of such a nature that specific performance cannot

be decreed. And thus, if this injunction were granted to the plaintiff, enforcing the negative covenant in the contract, and restraining the defendant from selling any other make of paper patterns, it would be entirely at the mercy of the plaintiff. The contract could not be enforced, nor any relief given to the defendant, if the plaintiff refused to perform its contract, while the injunction would restrain the defendant from carrying on its business by the sale of the other goods. There is thus the want of mutuality. "And it is a general principle that when, from personal incapacity, the nature of the contract, or any other cause, a contract is incapable of being enforced against one party, that party is equally incapable of enforcing it specifically against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former." Marble Co. v. Ripley, supra. See, also, Blackett v. Bates, 1 Ch. App. 117; Beck v. Allison, 56 N. Y. 366. In Beck v. Allison the action was brought by a lessee for the specific performance of an agreement made by the lessor to repair damages caused by fire, and the court held that specific performance of such a contract could not be decreed. The case of Prospect Park & C. I. R. Co. v. Coney Island & B. R. Co., 144 N. Y. 160, 39 N. E. 17, presents an entirely different question. In that case the contract had been executed by the plaintiff, and execution had been commenced by the defendant. It was a contract between two railroad companies, by which the plaintiff granted to the defendant the use of certain of its tracks for a period of 21 years. The defendant covenanted to run cars to the plaintiff's depot, connecting with the trains of the latter. The parties acted under the contract for upwards of 7 years, when the defendant ceased to run its cars to the plaintiff's depot, and advised the plaintiff that it did not intend to do so. Thus, the contract had been executed by the plaintiff; the court expressly finding that the plaintiff had substantially performed the contract on its part, and that, under the peculiar circumstances of that case, an injunction to enjoin the defendant from operating any of its cars unless it performed its contract with the plaintiff was not error. The provisions of the contract itself do not appear in the report. All we have from which we can judge of them is a statement of the court that "the provisions of the contract are neither complicated nor difficult, and are such as a court of equity can enforce in its discretion." In the case at bar the plaintiff had not performed its contract, and the provisions of the contract to be performed by both parties are both complicated and difficult, and such as a court of equity cannot enforce. The lack of mutuality which appears in this case was absent in that case. In Johnson v. Railway Co., 3 De Gex, M. & G. 914; Brett v. Shipping Co. 2 Hem. & M. 404, and Trading Co. v. Banner, L. R. 12 Eq. 23, the injunctions were refused because, from the nature of the contracts, as the court could not have directed a specific performance at the suit of the defendants it would not decree a specific performance of any part of the contracts at the suit of the plaintiffs. We must constantly bear in

mind that this contract to be performed is an executory contract. An entirely different question would be presented if the contract had been performed by the plaintiff, so that the defendant had actually received the consideration for which it was to do the act which the plaintiff seeks to compel it to do by this decree; but from the examination that I have been able to give of the authorities, in an endeavor to formulate a rule which can be fairly deduced from them, it seems to me that an executory contract, the execution of which involves the performance of a continuous series of acts, demanding the exercise of individual skill, discretion, taste, or talent on the part of one of the parties, which are, of necessity, incapable of judicial supervision or control, will not be specifically performed in equity, and that where such a contract is made, thus incapable of being specifically performed by a judgment in equity, a negative clause in the contract, which is purely an incident to the contract itself, and which from its terms purports to bind the party making it only during the time that the contract is being actually executed, will not be specifically enforced in equity. For these reasons I think the judgment appealed from was right, and should be affirmed.